## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT FOR THE STATE OF LOUISIANA

**EXPERT E&P CONSULTANTS, LLC**  **CIVIL ACTION NUMBER**
  **PLAINTIFF**

**VERSUS**

**BP EXPLORATION & PRODUCTION, INC.; BP AMERICA PRODUCTION COMPANY; BP P.L.C.; HALLIBURTON ENERGY SERVICES, INC.; SPERRY DRILLING SERVICES, A DIVISION OF HALLIBURTON ENERGY SERVICES, INC.; TRANSOCEAN, LTD; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN HOLDINGS, LLC AND TRITON ASSET LEASING GMBH**
  **DEFENDANTS**     **MAGISTRATE JUDGE**

**JUDGE**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, **ExPert E&P Consultants, LLC**, who does allege, aver and represent as follows:

## NATURE OF THE ACTION

1.

On or about April 20, 2010, the *Deepwater Horizon*, a mobile offshore drilling unit (MODU), a vessel in navigable waters, exploded and sank, causing a spill of over 200 million gallons of crude oil from the Macondo Well, MC-252 ("Oil Spill"), and resulting in the worst maritime environmental disaster in United States history.

2.

Plaintiff has suffered economic injury, damage and/or losses as a result of the Oil Spill.

## THE PARTIES, JURISDICTION AND VENUE

3.

Plaintiff, ExPert E&P Consultants, LLC, is an entity that is domiciled in St. Tammany Parish, with its principle place of business/operations in Madisonville, LA.

4.

Plaintiff brings these claims pursuant to Federal General Maritime Law and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §2701, *et seq*.

5.

Defendant, **BP Exploration & Production, Inc.** ("BP Exploration"), is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated. BP Exploration was designated as a "Responsible Party" by the United States Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714.   This Court has personal jurisdiction over BP Exploration because BP Exploration is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

6.

Defendant, **BP America Production Company** ("BP America"), is a Delaware corporation with its principal place of business in Houston, Texas.  BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America because BP America is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

7.

Defendant, **BP p.l.c.**, is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  At all material times, BP p.l.c. operated its various business divisions, such as the "Exploration and Production" Division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United State.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the United States more generally.  Plaintiff further adopts and incorporates by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Bundle Master Complaint, Record Document Number 1128, filed in the United States District Court for the Easter District of Louisiana, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, Case Number 2:10-MD-02179.

8.

BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

9.

Defendant, **Halliburton Energy Services, Inc.**, is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in the State of Louisiana.  Halliburton provided engineering services, materials, testing, mixing and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations.

10.

Halliburton division **Sperry Drilling Services** (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels and pressure fluctuations.  "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

11.

Defendant, **Transocean, LTD** ("Transocean Ltd"), a Swiss corporation that maintains substantial U.S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. At all material times, Transocean Ltd. was a party to the contract with BP America for the drilling of the Macondo well and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

12.

Defendant, **Transocean Offshore Deepwater Drilling, Inc.** ("Transocean Offshore"), a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

13.

Defendant, **Transocean Deepwater, Inc.** ("Transocean Deepwater"), a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated

with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

14.

Defendant, **Transocean Holdings, LLC** ("Transocean Holdings"), a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean, Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the blowout occurred and the Oil Spill originated. Transocean Holdings was a party to the contract with BP America regarding the charter of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico. On April 28, 2010, the U. S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil and/or diesel fuel spill resulting from the sinking of the vessel *Deepwater Horizon*.

15.

Defendant, **Triton Asset Leasing GmbH** ("Triton"), a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, manager owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

**JURISDICTION AND VENUE**

16.

Venue is proper in this jurisdiction because Defendants' actions, inactions, and failures directly and proximately caused the damage and harm to Plaintiff in this jurisdiction.

17.

Under Fed. R. Civ. P. 82, no allegation of venue is required for admiralty or maritime claims. Moreover, prosecution and venue in this district is proper under 28 U.S.C. §1391 because Defendants do business herein, Plaintiff resides and does business herein, and the events or omissions giving rise to the claims asserted herein occurred in this district.  Venue is also proper pursuant to the OPA, 33 U.S.C. 2717(b), as the discharge occurred in this district.  Venue is also appropriate in this district consistent with 28 U.S.C. §1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation.  *See*, *In Re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010), and this Court's Pretrial Order Number 20 [Rec. Doc. 904], which allows Plaintiff to directly file its complaints arising out of the Oil Spill in this District.

18.

Jurisdiction exists before this Court pursuant to article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

19.

The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff hereby designates this case as an admiralty or maritime case and request a non-jury trial, pursuant to Rule 9(h).

20.

That portion of the Plaintiff's claim based on general maritime law including its claim for damages against Transocean and Halliburton for compensatory and punitive damages as well as its non-OPA claim for compensatory and punitive damages against BP should not be, it is respectfully

submitted, barred by *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) because *Robins* does not or should not apply to this case and, to the extent that it does apply, should be overturned to allow for the recovery of these damages under the general maritime law. See, *e.g.*, Thomas C. Galligan & Brittan J. Bush, *Displacement and Preemption: The OPA's Effect on General Maritime Law and State Tort Law Punitive Damages Claims*, 42 Cumb. L. Rev. 1, 56 (2012); Matthew Chalker, *A Line Drawn in the Sand that Should be Washed Away: Recovery for Pure Economic Loss in Maritime Cases and the Reliance on Robins Dry Dock V. Flint*, 15 U. Balt. J. Envtl. L. 151, 171 (2008).

21.

Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

22.

Plaintiff made"presentment" of a Claim in accord with 33 U.S.C. §§ 2702(b) and 2713, by submitting a description of the claim with a "sum certain" and some supporting documentation to BP as the "responsible party" under OPA *via* email and U.S. Mail, on or about January 17, 2013.

23.

BP otherwise failed to respond within 90 days of presentment.

## **FACTUAL ALLEGATIONS**

24.

Plaintiff adopts and incorporates as if fully restated herein the factual allegations, causes of action and prayer for relief, raised in the Amended B1 Bundle Master Complaint, Record Document Number 1128, filed in the United States District Court for the Easter District of Louisiana, *In Re:*

*Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, Case Number 2:10-MD-02179 (the "MDL Complaint").

25.

Plaintiff further adopts and incorporates as if restated herein all factual allegations information contained in the Direct Filing Short Form/Short Form Joinder, Rec. Doc. No. 128394, filed by ExPert E&P Consultants, LLC into the United States District Court for the Eastern District of Louisiana, Case Number 2:10-CV-08888.

26.

Plaintiff further adopts and incorporated as if fully restated herein Plaintiffs' Supplemental and Amended Responses to Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011; and Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012.

27.

At all times relevant herein, the vessel *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, and pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), later amendments to that agreement.

28.

On April 20, 2010, while temporarily abandoning a subsea oil well located at the Macondo prospect site in the area of the Gulf of Mexico known as Mississippi Canyon 252 ("Macondo well"), employees and agents of BP and its subcontractors, including Transocean and Halliburton entities named as defendants herein (collectively "Defendants"), aboard the vessel *Deepwater Horizon* lost

control of the well and caused a massive blowout.

29.

After the *Deepwater Horizon* sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for over twelve weeks, fouling the environment, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment, the economy of the Gulf states and businesses including Plaintiff and others working in and near the Gulf of Mexico. Meanwhile, BP downplayed the severity of the Oil Spill and was unprepared for the massive clean-up effort required.

30.

Prior to the Oil Spill, Defendants had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* operation, equipment and maintenance that could lead to loss of life, serious injury and/or environmental damage, including problems with the vessel's Blowout Preventer ("BOP"), electronic fire and gas and alarm systems, computer software systems, purge air systems and other vessel equipment.

31.

Further, BP's failure to plan, monitor, control, and contain the well, as well as failure to mitigate risk and damages, sprang from long-standing grossly negligent, willful, wanton, reckless, callous and consciously indifferent conduct on the part of the corporate management of BP and its subcontractors.

32.

As described more fully below, the loss of well control and resulting harm was due to the negligent, willful, wanton, consciously indifferent, reckless, callous and grossly negligent actions on the part of Defendants before, during, and after the blowout, including long-standing wanton

misconduct by Defendants' corporate management.

## PRE-BLOWOUT FACTS

33.

Defendants struggled with the high temperature, high pressure Macondo Well repeatedly before the catastrophic events of April 20, 2010.  In emails weeks before the blowout, BP employees referred to the Macondo Well as "crazy," a "nightmare" well, and the "well from hell."

34.

*Deepwater Horizon* workers struggled to control the problematic well throughout drilling, having suffered numerous kicks, ballooning and lost return events due to the unreasonably dangerous geological characteristics and narrow drilling margins at Macondo and lack of care in drilling operations under these conditions.

35.

As these problems caused the drilling schedule to fall farther behind schedule and over budget, Defendants, and BP in particular, drilled too fast for the conditions, maintained an unreasonably high rate of penetration in the drilling effort at Macondo and drilled at a rate where drilling outpaced the BP petrophysics crew's ability to predict down hole conditions and provide guidance on foreseeable hazards.

36.

BP drilled ahead too fast and did not maintain a safe drilling margin, did not provide all or accurate information to the MMS, thereby violating Federal Regulations and good oilfield practice. On December 7, 2011, the Federal Bureau of Safety and Environmental Enforcement ("BSEE") cited BP for four counts of violation of 30 C.F.R. § 250.427(b) for BP's knowing failure to suspend

drilling operations at Macondo when the federally mandated safe drilling margin was no longer present in the well.

37.

Pursuant to its Drilling Contract, BP was paying approximately $500,000 per day to lease the *Deepwater Horizon*, not including contractors' fees. BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

38.

At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease, operation costs and contractor fees, and putting them increasingly over budget. This excess cost put the Macondo project in conflict with BP's recent mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico. In spite of the difficult and dangerous nature of the Macondo Well, Defendants made multiple decisions about the drilling plan for purely economic reasons, even though those decisions introduced unnecessary risks and increased the risk of a catastrophic blowout of the well.

39.

Defendants intentionally violated industry guidelines and government regulations, and ignored warnings from their own employees and contractors on the *Deepwater Horizon*, specifically to reduce costs and save time on the dilatory and over-budget Macondo Well

40.

This emphasis on speed and money over safety led to numerous errors and omissions by BP and its subcontractors, which, in turn, caused and/or contributed to the blowout and the subsequent Oil Spill.  Among these errors and omissions showing callous disregard for safety were the following:

A.      Decision to use a long string instead of a liner;

B.      Decision to use six instead of twenty-one centralizers;

C.      Decision not to run a bottoms up circulation;

D.      Decision to pump cement slurry that was defective in design, inadequately tested, and had very low probability of success;

E.      Decision to pump a defective cement slurry without waiting for all necessary cement slurry test results;

F.      Decision not to run a Cement Bond Log — Saved 12 to 16 hours of rig time;

G.      Decision to run a positive pressure test without waiting for the cement to set;

H.      Decision to run a negative pressure test without waiting for a full risk assessment;

I.      Decision to displace to seawater before validating that a proper barrier to flow was in place despite clear signs that the cement did not work, zonal isolation and well integrity had not been achieved, and that hydrocarbons were likely to flow into the well; and

J.      Decision to order simultaneous operations to occur during critical displacement phase.

41.

Prior to beginning cementing operations on the Macondo well production casing, Halliburton was contractually obligated to design and test its cement slurry to ensure it would achieve zonal isolation in the face of the narrow drilling margin and the gaseous nature of the hydrocarbon reservoirs surrounding the well.

42.

Halliburton (Sperry) was contractual obligated to provide mudlogging services which

included the safety critical job of monitoring the well for kicks.

43.

Halliburton ultimately recommended a foam cement slurry to seal the bottom of the Macondo well. Foam cement is cement that is injected with nitrogen gas on the rig at the time the cement is pumped, in order to lower its density. However, Halliburton's base cement contained additives that were inconsistent with foamed cement and violated Halliburton's best practices, technical bulletin, policies and procedures, and good oilfield practice.

44.

Despite having knowledge that the slurry would likely fail, Halliburton intentionally designed the cement slurry improperly and failed to test its slurry design adequately to ensure that zonal isolation would be achieved at Macondo.

45.

The negative pressure tests conducted on April 20, 2010 were intended to assess the integrity of the defective cement job at the bottom of the Macondo Well. The two negative pressure tests accurately yielded abnormal results that were clear signs that the cement did not work, zonal isolation and well integrity had not been achieved and that the hydrocarbons were likely able to flow into the well. Yet, BP decided to displace the well anyway, the well was displaced and began to flow shortly thereafter.

46.

Both BP and Transocean have pled guilty to criminal charges for the grossly negligent actions of their employees and agents in failing to properly analyze the results of the negative pressure test and cease operations at that time.

47.

Halliburton was also grossly negligent in ignoring the negative pressure test results and not insisting upon an immediate remedial cement job to correct the evident cement failures. Halliburton was fully aware of the environmental and safety risks of a failed cement job, yet it did not ensure that the appropriate action be taken to correct the Macondo well's cement seal.

48.

Given the history of the Macondo Well and the decisions Defendants made to save time and money completing the well, they should have been particularly attuned to any signs of trouble during the temporary abandonment phase on April 20, 2010. But instead of the requisite vigilance, BP and its subcontractors failed to properly monitor the well and ignored and/or missed an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

49.

Pressure and flow data from the well in the two hours before the blowout should have put Defendants on notice that there was a problem and that hydrocarbons were leaking into the well. The first indications of hydrocarbons flowing into the well occurred at 8:52 p.m., yet went unnoticed by Defendants for forty-nine minutes despite the numerous indicators that the well was rapidly filling with hydrocarbons flowing past the blowout preventer and into the riser, where they had an unimpeded route to the vessel.

50.

During this safety critical time, Halliburton mudlogger Joseph Keith admitted that he left his post in the mudlogger shack. Keith missed and/or misinterpreted key data from the well clearly showing safety critical anomalies, which he never saw and/or saw and misinterpreted and never reported this data to anyone before the surface blowout began.

51.

Throughout the evening of April 20, 2010, the actions of the *Deepwater Horizon* workers demonstrated a lack of training, lack of situational awareness, and carelessness, all of which caused them to ignore or overlook the harbingers of a blowout.

52.

Defendants' policies and instructions regarding emergency well control procedures were woefully inadequate. The procedures only contemplated relatively small influxes into the well and did not provide guidance on what to do if the initial procedures failed to stop the influx, what to do if hydrocarbons made it past the BOP and into the riser, or whether and when to activate emergency BOP functions.

53.

Due to the mud spurting out of the riser at or about 9:41 p.m., flow was diverted from the well into the vessel's mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air. This diversion would have been the correct protocol if this incident had been a small kick. However, for a blowout of this magnitude, diversion through the mud-gas separator only exacerbated the disaster because the mud-gas separator was incapable of handling large amounts of gas and gas venting pipes on the mud-gas separator vented gas back down onto the vessel. When huge volumes of gas began to escape from the well, these goosenecked vents effectively spread highly flammable gas all over the vessel's decks, increasing the likelihood that the gas would find an ignition source.

54.

Investigations and testimony suggest that the initial explosion on the *Deepwater Horizon* on the night of April 20, 2010 was caused by engine #3, which sucked in the gas flowing down on the

decks from the mud-gas separator vents.

55.

The vessel was equipped with gas sensors designed to prevent explosions by initiating a shutdown of certain vessel engines and engine room air intakes when combustible gas was present. The automated features that should have closed the engine room dampeners and the engine's air intake valves upon sensing gas entering the engine room all failed but did not do so because they had been placed in bypass.

56.

At approximately 9:48 p.m., the gas sucked into the *Deepwater Horizon's* Engine Number 3 caused it to rapidly overspeed. The vessel lost power a minute later, followed by two explosions that ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well. These flow paths continued unabated until the vessel sank on April 22, 2010.

57.

Problems and failures with each of the BOP's emergency activation methods prevented the use of the *Deepwater Horizon's* BOP to seal the well, compromising its shear rams that should have slammed shut, severed the drill pipe, and shut in the well.

58.

The BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence ("EDS"), the automatic mode function ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or autoshear functions. None of these were able to activate the BOP to seal the well.

59.

After the explosion, the vessel crew tried unsuccessfully to activate the emergency disconnect sequence on the *Deepwater Horizon's* BOP. However, the explosions and fire on the *Deepwater Horizon* disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS. From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the BOP on the seafloor. On the vessel, these multiplex cables were not protected against explosions or fire. They were damaged by the explosions, effectively disabling the vessel workers' ability to communicate with the BOP.

60.

The *Deepwater Horizon's* BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality. Transocean's grossly negligent BOP maintenance prevented either of the two pods from completing the AMF sequence on the night of the blowout. Examination and tests performed on the control pods after the disaster found a refurbished and miswired solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. Transocean's BOP maintenance records from 2001 to 2010 indicate that the control pod batteries were not changed annually as recommended by the BOP manufacturer.

61.

BOP maintenance was Transocean's responsibility, but BP was aware of Transocean's infrequent and inadequate maintenance of the device and failed to take corrective action or insure that Transocean take corrective action.

62.

Beyond these specific BOP maintenance issues, Defendants were also aware that during the entire duration of operations at Macondo, the *Deepwater Horizon's* BOP was out of certification and long overdue for extensive maintenance and repair. Although the BOP's manufacturer, Cameron, required manufacturer testing of the device every five years, the *Deepwater Horizon's* BOP had not been sent to Cameron for inspection since 2000.

63.

A Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, revealed numerous problems with the *Deepwater Horizon's* BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves.

64.

Transocean also knowingly failed to recertify the *Deepwater Horizon's* BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime. Transocean simply substituted its condition-based maintenance program for the best practices recommended by Cameron and required by federal regulations, and continued to use the BOP.

65.

Defendants failure to properly maintain the *Deepwater Horizon's* BOP violated 30 C.F.R. § 250.446(a) by failing to maintain the *Deepwater Horizon* BOP system in accordance with API RP 53 section 18.10.3, and contributed to the vessel crew's inability to control the Macondo well on April 20, 2010.

66.

Pursuant to 33 C.F.R. 250.107, Defendants were required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition. They were further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations. Defendants willful violation of these regulatory mandates caused and/or contributed to the Macondo well blowout and the subsequent explosions, fire, sinking and Oil Spill.

67.

Decisions, tradeoffs, actions, and inactions by BP, including the risky well design, procedures that deviated from good oilfield practices, industry norms, and failure to identify and train for foreseeable risks all unnecessarily created and enhanced the risks associated with the drilling and temporary abandonment of the Macondo Well. This reckless willful and behavior culminated in insufficient well monitoring and failure to recognize the signs of an influx for 49 minutes prior to the blowout.

68.

Underlying it all, Defendants' corporate cultures of trading risk identification, mitigation and safety for speed, production and profit made this catastrophe inevitable.

69.

Further undermining the safety of those on the rig, discord, dysfunction, recklessness and gross negligence and willful and wanton behavior pervaded the actions of the BP onshore well team. Emails from individuals such as Wells Team Leader John Guide and his supervisor, BP's operations

leader at Macondo, Operations Manager David Sims exemplified this willful, wanton, reckless and callous disregard for human and environmental health and safety.

70.

The substantial evidence of BP's misguided priorities and imprudent decisions regarding the Macondo Well is all part of a longstanding culture of profit and production over protection and safety in BP's deepwater drilling operations. Corporate leaders from Houston to London to Switzerland did not take potentially catastrophic risks of deepwater drilling seriously, did not identify foreseeable risks unique to deepwater drilling and allowed those risks to result in the April 20, 2010 disaster.

71.

Transocean's willful, reckless and grossly negligent conduct was the product of its admitted, acknowledged and uncorrected longstanding safety culture and training deficiencies.

72.

Halliburton's willful, reckless and grossly negligent conduct was the product of its known longstanding and uncorrected systemic failures of safety and organization.

## POST-BLOWOUT FACTS

73.

On the night of April 20, 2010 after the explosions ignited the vessel, the resulting gas-fueled fire on the *Deepwater Horizon* raged for two days until she finally sank on April 22, 2010. The *Deepwater Horizon* was connected to the wellhead at the seafloor by a 5,000 foot marine riser pipe and as the vessel sank to the seafloor, it dragged the riser down with it, bending and breaking the pipe before finally tearing away from it completely. Immediately oil and natural gas began to gush

from the open end of the riser and from at least two places along its twisted length.

74.

For eighty-seven days, the gushing oil and gas continued unabated and the Oil Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone and ultimately the entire Gulf of Mexico.

75.

From the outset, BP intentionally downplayed and concealed the severity of the Oil Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day. An internal BP document proves that the company's own analysis had shown that the rate of oil flow could reach as high as 100,000 barrels or 4,200,000 gallons per day.

76.

Despite known existing technology and methods, BP Chief Operating Officer Doug Suttles admitted that as of April 20, 2010, BP did not have a response plan with "proven equipment and technology" that could contain the Macondo Well. BP p.l.c. CEO Tony Hayward stated that "BP's contingency plans were inadequate" and that the company had been "making it up day to day." In its official statement, BP made the same admission: "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

77.

Upon information and belief, BP actually hindered efforts to kill the Macondo Well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about deepwater blowout response told BP how to kill the well in June 2010.  But BP chose to ignore the engineers' well-kill

procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP hoped to retap the Macondo Well and its massive reservoir, they intentionally ignored expert advice that could have killed the well many weeks earlier.

78.

These gross failures, intentional, willful, wanton, callous, reckless and consciously indifferent acts and omissions ensured that this Oil Spill became the largest environmental disaster in the history of the United States.

79.

Due to the events, actions and inactions of BP described herein, commercial offshore activity in the Gulf of Mexico and surrounding waters ceased, and individuals and entities that rely on the use of the Outer Continental Shelf ("OCS") and its resources to generate revenues suffered both immediate and long-term economic harm.

## THE MORATORIA WAS A DIRECT AND FORESEEABLE CONSEQUENCE

80.

As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the United States Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance ("SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP") (40 C.F.R. §300.323).  The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

81.

On April 30, 2010, MMS and the United States Coast Guard ("USCG"), as a direct and foreseeable result of the Oil Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors. This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it is capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

82.

Also on April 30, 2010, as a direct and foreseeable result of the Oil Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the *Deepwater Horizon* explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

83.

On May 7, 2010, MMS, as a direct and foreseeable result of the Oil Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

84.

In response to the President's directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* ("Safety Report").

85.

In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling.  In particular, the Safety Report targeted the effectiveness of blowout preventers ("BOP") and also called for measures to promote the integrity of wells, to enhance well control and to foster a culture of safety through operational and personnel management.

86.

Among the measures from the Safety Report which took immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days — converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Oil Spill and its environmental devastation.

87.

On May 28, 2010, based on the Safety Report and its recommendations which were the direct and foreseeable consequences of the Oil Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the

environment."

88.

As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend certain well drilling activity in the OCS.  On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratoria ("May Moratoria") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices and procedures.

89.

Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS.  It also prohibited drilling any wellbore sidetracks and bypasses.  Moreover, it halted spudding of any new wells.  It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

90.

Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Oil Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected thirty-three active deepwater drilling rigs in the Gulf of Mexico.

91.

On the heels of its directive to implement the deepwater moratoria, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8,

2010, calling for seven new, increased safety measures for drilling permits on the OCS. The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04. These actions were taken as a direct and foreseeable result of the Oil Spill and its environmental devastation.

92.

On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Oil Spill's environmental devastation and BP's incapacity to adequately respond to the Oil Spill. NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and Oil Spill response plans to include worst-case discharge and blowout scenarios.

93.

On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratoria effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

94.

In accordance with the Court's Order, in June 2010, the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratoria was unenforceable.

95.

On July 12, 2010, the Secretary of the Interior issued a new Decision Memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain

drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 ("July Moratoria").

96.

In particular, the Secretary found that because the available response vessels, personnel and other resources were consumed with the Oil Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

97.

That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratoria.  The July Moratoria also allowed for the possibility of the July Moratoria being lifted before November 30, 2010.

98.

With certain exceptions, the July Moratoria suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratoria had no bearing on production activities, drilling operations that were necessary to conduct emergency activities, drilling operations necessary for completions or workovers, abandonment or intervention operations, or waterflood, gas injection or disposal wells.

99.

The July Moratoria also instructed MMS to develop and gather information about safety, blowout containment capabilities and Oil Spill response capability, and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October 2010.

100.

On October 12, 2010, the United States Department of Interior announced that the federal government would lift the July Moratoria. The October announcement indicated an early end to the July Moratoria, which had been scheduled to extend through the month of November 2010.

101.

On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

102.

In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control such as the kind experienced in the Oil Spill.

103.

On January 3, 2011, MMS notified thirteen oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

104.

The economic impacts of the Oil Spill and its environmental devastation affected individuals and businesses in various industries across the Gulf Coast OCS and the Pacific OCS, including Plaintiff herein.

105.

The Oil Spill and the foreseeable governmental response to a disaster of this magnitude including the moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals and entities that rely on the use of the Outer Continental Shelf and its resources in connection with offshore deepwater drilling activities, including Plaintiff herein.

## PLAINTIFF'S DAMAGES

106.

At all time pertinent, Plaintiff provided a full spectrum of well drilling services to offshore oil and gas industry clients in the Gulf of Mexico. Services provided by ExPert E&P Consultants, LLC include well design and detailed project and well planning; well testing and completion services; drilling program and procedures services, including deepwater and directional drilling; well execution support; field development planning; and HSE and Regulatory program review and implementation.

107.

Plaintiff's monthly income is tied directly to the strength of the offshore oil and gas industry. Any slow down in that industry negatively impacts Plaintiff's workload and monthly income.

108.

The April 20, 2010 blowout of the Macondo well and consequent explosion, fire vessel sinking and massive oil spill, and the substantial environmental damages, resulted in a slow down in the offshore oil and gas industry while the full impact of the spill was being determined, and causing Plaintiff to suffer substantial reductions in its monthly workload and incomes.

109.

Commencing on April 20, 2010 and continuing through today and into the foreseeable future, Plaintiff has suffered and will continue to suffer economic damages in the form of past and future lost revenue, past and future lost business opportunity and diminution in the value of company assets due to the April 20, 2010 casualty described herein, in amount to be proven at trial of this cause.

110.

There were no other events, occurrences, actions or inactions that caused Plaintiff's losses, no superceding or intervening cause(s) of Plaintiff's losses, and no other events, occurrences, actions or inactions that factually or legally relieve or reduce BP Explorations's strict liability or the damages owed to Plaintiff under OPA.

## CLAIMS FOR RELIEF

111.

Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinder No.128394, against the Defendants as responsible parties under the Oil Pollution Act, 33 U.S.C. §2701, *et seq.*, which holds responsible parties liable to Plaintiff for removal costs and damages arising out of the following:

A.     Loss of Natural Resources;

B.      Loss or Damage to Real or Personal Property;

C.      Subsistence Use;

D.      Loss of Revenues;

E.      Loss of Profits and/or Earning Capacity; and

F.      Loss of Public Services.

112.

Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinder No.128394, against all Defendants identifying General Maritime Law causes of action and claims for relief relating to negligence and gross negligence and willful, wanton, reckless, callous and consciously indifferent misconduct.

113.

Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinder No. 128394, against all Defendants for Punitive Damages arising out of the willful, wanton, reckless, and consciously indifferent misconduct and gross negligence as alleged and described herein and in the MDL Complaints.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, ExPert E&P Consultants, LLC, demands judgment against Defendants, jointly, severally, and *in solido,* as follows:

I.      Economic and compensatory damages in amounts to be determined at trial;

II.     Punitive Damages;

III.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

IV.     Reasonable claims preparation expenses;

V.      Attorneys' fees;

VI.     Costs of litigation; and

VII.    Such other and further relief available under all applicable state and federal laws and

        any relief the Court deems just and appropriate.


                                        By attorneys:


                                        _s/John W. deGravelles_____
                                        **JOHN W. deGRAVELLES** (#04808)
                                        J. NEALE deGRAVELLES (#29143)
                                        deGravelles, Palmintier, Holthaus & Frugé, L.L.P.
                                        618 Main Street
                                        Baton Rouge, Louisiana  70801-1910
                                        Telephone:  225/344-3735
                                        Facsimile:  225/336-1146
                                        jdegravelles@dphf-law.com
                                        ndegravelles@dphf-law.com



**PLEASE SERVE:**

**BP EXPLORATION & PRODUCTION, INC.**
Through their registered agent:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA  70808

**BP AMERICA PRODUCTION COMPANY**
Through their registered agent:
CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA  70808

**BP P.L.C.**
through its register agent for service:
C T Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

**HALLIBURTON ENERGY SERVICES, INC.**
Through its Attorney of Record:
Donald E. Godwin
Godwin Lewis PC
1201 Elm Street, Suite 1700
Dallas, TX  75270

**SPERRY DRILLING SERVICES, A DIVISION OF
        HALLIBURTON ENERGY SERVICES, INC.**
Through its Attorney of Record:
Donald E. Godwin
Godwin Lewis PC
1201 Elm Street, Suite 1700
Dallas, TX  75270

**TRANSOCEAN, LTD**
Through its agent for service
Post Office Box 2765
Houston, TX  77252-2765

**TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.**
Through its Attorney of Record:
Kerry J. Miller
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA  70163

**TRANSOCEAN DEEPWATER, INC.**
Through its Attorney of Record:
Kerry J. Miller
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA  70163

**TRANSOCEAN HOLDINGS, LLC**
Through its Attorney of Record:
Kerry J. Miller
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA  70163

**TRITON ASSET LEASING GMBH**
Through its Attorney of Record:
Kerry J. Miller
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA  70163